MILBERG WEISS BERSHAD
HYNES & LERACH LLP
REED R. KATHREIN (139304)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
-and-
WILLIAM S. LERACH (68581)
DARREN J. ROBBINS (168593)
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALD E. VANGSGARD, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ARIBA, INC., KIRK A. CRUIKSHANK, RUNE C. ELIASEN, ROBERT J. DeSANTIS, PAUL HEGARTY, EDWARD P. KINSEY, KARL C. KLEISSNER and KEITH J. KRACH,<br><br>Defendants. | No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

**INTRODUCTION**

1. This is an action on behalf of purchasers of Ariba, Inc. ("Ariba" or the "Company") publicly traded securities during the period from January 11, 2000 to January 15, 2003 (the "Class Period"). Ariba is a spend-management software solutions provider. Ariba provides software, services and network access to enable corporations to evaluate and manage the cash costs associated with running their business.

2. On January 15, 2003, the Company issued a press release entitled, "Ariba Provides Update on Accounting Review and Restatement of Financial Statements." The press release stated in part:

> Ariba, Inc. announced today that it will restate its financial statements for the fiscal years ended September 30, 2001 and 2000 and for the quarters ended March 31, 2000 through June 30, 2002 as a result of an ongoing review of accounting matters. The company also announced that because this review is not yet completed, it has not yet filed its annual report on Form 10-K for the fiscal year ended September 30, 2002 with the Securities and Exchange Commission.
>
> As previously disclosed, Ariba has determined that, for accounting purposes, it should treat a $10.0 million payment provided personally by Keith Krach, Ariba's chairman and co-founder, in March 2001 to Larry Mueller, its president and chief operating officer at the time, as a $10.0 million capital contribution from Mr. Krach to Ariba and the payment of compensation from Ariba to Mr. Mueller. Because no company funds were used and there was no commitment to or from Ariba, the company originally viewed the payment as a personal transaction.
>
> The company has further determined that chartered air services, provided personally by Mr. Krach to Mr. Mueller, should be treated similarly as a capital contribution from Mr. Krach to Ariba and a payment of compensation from the company to Mr. Mueller. These services were provided over the period from September 2000 through July 2001 at a total cost of $1.2 million.
>
> In addition, Ariba has concluded that certain stock options issued to a limited number of individuals by companies that Ariba acquired during fiscal 2000 should be accounted for as stock-based compensation expense to Ariba, rather than amortized as goodwill. As a result, an increase in non-cash stock-based compensation expense and a reduction of goodwill amortization expense will be reflected in Ariba's restated financial statements for fiscal 2000, 2001 and 2002.
>
> None of the above-described adjustments has any impact on Ariba's cash balances or net cash flows for any period. In addition to the $10.0 million payment, the adjustment for the chartered air services amounts to $1.2 million. The cumulative adjustments related to the stock options amount to $7.5 million, consisting of increases to Ariba's expenses for fiscal 2000 and 2001 of $8.7 million and $12.0 million, respectively, and a reduction of expenses for fiscal 2002 of $13.2 million.
>
> As a result of these accounting adjustments investors should not rely on the financial information contained in the company's previously filed annual report on

> Form 10-K for the fiscal years ended September 30, 2000 and September 30, 2001 or in the company's quarterly report on Form 10-Q for the quarters ended March 31, 2000 through June 30, 2002.
>
> The ongoing accounting review is focused on the company's fiscal 2000 financial statements. Ariba is committed to performing a complete and thorough review of these matters and expects the review to be completed by the end of February 2003. Ariba intends to file its annual report on Form 10-K for the fiscal year ended September 30, 2002 after the completion of the review.
>
> Ariba also announced that it expects to receive a Nasdaq staff determination that it is subject to delisting from the Nasdaq Stock Market as a result of failing to timely file its annual report on Form 10-K for the fiscal year ended September 30, 2002. Upon receipt of this determination, Ariba intends to request a hearing before a Nasdaq panel to review the staff determination. There can be no assurance that the Nasdaq panel will grant Ariba's request for continued listing.

3. While Ariba's financial statements were admittedly false, the Company's top officers and directors took advantage of this and sold nearly $692 million worth of their Ariba shares to the unsuspecting public.

**JURISDICTION AND VENUE**

4. The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"). Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act as defendant Ariba and/or the individual defendants conduct business in and the wrongful conduct took place in this District.

**THE PARTIES**

5. Plaintiff Gerald E. Vangsgard purchased Ariba publicly traded securities as detailed in the attached Certification and was damaged thereby.

6. Defendant Ariba is a spend-management software solutions provider. Ariba provides software, services and network access to enable corporations to evaluate and manage the cash costs associated with running their business.

7. Defendant Kirk A. Cruikshank ("Cruikshank") was Executive Vice President of Ariba. During the Class Period, Cruikshank reaped more than $46 million in insider trading proceeds.

8. Defendant Rune C. Eliasen ("Eliasen") was Vice President and a director of Ariba. During the Class Period, Eliasen reaped over $51 million in insider trading proceeds.

9. Defendant Robert J. DeSantis ("DeSantis") was an officer and Executive Vice President of Ariba. During the Class Period, DeSantis reaped over $189 million in insider trading proceeds.

10. Defendant Paul Hegarty ("Hegarty") was a director of Ariba. During the Class Period, Hegarty reaped over $83 million in insider trading proceeds.

11. Defendant Edward P. Kinsey ("Kinsey") was CFO and Executive Vice President of Ariba. During the Class Period, Kinsey reaped over $97 million in insider trading proceeds.

12. Defendant Karl C. Kleissner ("Kleissner") was Senior Vice President of Ariba. During the Class Period, Kleissner reaped over $46 million in insider trading proceeds.

13. Defendant Keith J. Krach ("Krach") was CEO and a director of Ariba. During the Class Period, Krach reaped over $180 million in insider trading proceeds.

14. Defendants Cruikshank, Eliasen, DeSantis, Hegarty, Kinsey, Kleissner and Krach are the "Individual Defendants." They are liable for the false statements pleaded in ¶¶15-17 and 19-22, as those statements were "group-published" information.

## FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

15. On January 11, 2000, the Company issued a press release entitled, "Ariba Announces Record First Quarter Revenues of $23.5 Million, Up 243%; Net Loss Per Share $0.07, Beats First Call Estimates." The press release stated in part:

> Ariba, Inc., the leader in business-to-business electronic commerce, today announced record results for the first quarter ended December 31, 1999.
>
> Revenues for the first quarter of fiscal 2000 marked the largest quarter in Ariba's history at $23.5 million, up 243 percent from the same period last year. Net loss for the quarter excluding the amortization of stock-based compensation was $5.6 million or a loss of $0.07 per share, beating the First Call consensus estimate of a loss of $0.11 per share. During the corresponding quarter in fiscal 1999, the net loss was $1.2 million or a loss of $0.07 per share, excluding the amortization of stock-based compensation. Including the amortization of stock-based compensation, net loss for the first quarter of fiscal 2000 was $10.3 million or a loss of $0.13 per share.

16. On April 12, 2000, Ariba issued a press release entitled, "Ariba Announces Record Second Quarter Revenues of $40 Million, Up 322%; Net Loss Per Share $0.06, Beats First Call Estimates." The press release stated in part:

> Ariba, Inc., the leading business-to-business (B2B) eCommerce platform provider, today announced record results for the second quarter ended March 21, 2000.
>
> Revenues for the second quarter of fiscal 2000 marked the largest quarter in Ariba's history at $40.0 million, up 322 percent from the same period last year. Net loss for the quarter excluding non-operating charges was $11.5 million or a loss of $0.06 per share, beating the First Call consensus estimate of a loss of $0.08 per share. During the corresponding quarter in fiscal 1999, the net loss was $2.8 million or a loss of $0.07 per share, excluding non-operating charges. Including all charges, net loss for the second quarter of fiscal 2000 was $125.9 million or a loss of $0.70 per share, reflecting costs associated primarily for acquisitions. All results are adjusted for a 2-for-1 stock split effective March 31, 2000.
>
> * * *
>
> "The second quarter was a watershed period for Ariba. We increased our customer base by over 100 percent and grew our revenue by 322 percent," said Keith Krach, chairman and chief executive officer of Ariba. "At the same time, we beat analyst EPS expectations and showed another consecutive quarter of cash flow positive from operations, demonstrating the Company's ability to grow rapidly while continuing to show high quality financial performance."

17. On July 12, 2000, Ariba issued a press release entitled, "Ariba Announces Record Third Quarter Revenues of $80.7 Million, Up 578%; Net Loss Per Share $0.05, Beats First Call Estimates." The press release stated in part:

> Ariba, Inc., the leading business-to-business (B2B) eCommerce platform and network services provider, today announced record results for the third fiscal quarter ended June 30, 2000.
>
> Revenues for the third quarter of fiscal 2000 marked the largest quarter in Ariba's history at $80.7 million, up 101 percent from the previous quarter and up 578 percent from the same period last year. Net loss for the quarter excluding non-operating charges was $11.3 million or a loss of $0.05 per share, beating the First Call consensus estimate of a loss of $0.08 per share. During the corresponding quarter in fiscal 1999, the net loss was $6.0 million or a loss of $0.11 per share, excluding non-operating charges.
>
> "Our focus on delivering quality technology, deployment excellence, great partnerships and customer driven results is once again manifested in our high quality financial performance this quarter. We doubled our revenues from last quarter, signed more than 100 new deals, and deployed more than twice as many customers as last year," said Keith Krach, Ariba's chairman and chief executive officer. "Going forward, Ariba will continue to provide the leadership, innovation and underlying B2B infrastructure creating unprecedented value for buyers, suppliers and markeplaces."

18. On October 18, 2000, *Bloomberg* carried an article entitled, "Ariba 4th-Qtr Loss Widens on Higher Expenses as Sales Surge." The article stated in part:

> Ariba, Inc., which makes software to help companies buy and sell goods over the Internet, said its fourth-quarter loss widened as expenses surged and sales rose more than eightfold.
>
> The loss widened to $339.3 million, or $1.50 a share, from $9.88 million, or 7 cents, a year ago. Excluding amortization, Ariba lost $1.06 million, or break-even a share. On that basis, it was expected to lose 5 cents a share, the average estimate of 37 analysts polled by First Call/Thomson Financial. Sales rose to $134.9 million from $17.1 million.
>
> Ariba's losses and revenue are growing as the software maker boosts sales staff and marketing expenses to win business customers and build Web marketplaces where companies can buy and sell supplies. Operating expenses roles to $117.5 million, from $19.9 million a year ago.

19. On April 20, 2001, the Company issued a press release entitled, "Ariba Announces Second Quarter 2001 Results; Q2 Fiscal 2001 Revenues up 126 Percent Year Over Year." The press release stated in part:

> Ariba, Inc., the leading business-to-business (B2B) eCommerce platform and network services provider, today announced results for the fiscal second quarter ended March 31, 2001.
>
> Revenues for the second quarter of fiscal 2001 were $90.7 million, up 126 percent from the same period last year. Pro forma net loss for the quarter excluding certain special charges was $48.3 million, or a loss of $0.20 per share. During the corresponding quarter in fiscal 2000, the comparable pro forma net loss was $11.5 million, or a loss of $0.06 per share, excluding certain special charges.
>
> * * *
>
> On April 2 the company revised its guidance for the quarter, reflecting the weakening macroeconomic climate. The Company also announced a plan to reduce spending across all major areas, including a reduction in workforce by approximately 30 percent of the total employee base.
>
> "The slowdown in both the economy and technology spending impacted our business more dramatically than we had expected," said Bob Calderoni, Ariba's CFO. "While the current uncertain market conditions provide low visibility going forward, we took decisive and immediate actions to realign our expense structure to reflect today's economic realities. We believe a strong focus on operational efficiencies and financial discipline will help us weather the current environment and should position us well as the economy recovers."
>
> As a result of the difficult economic conditions and other factors, Ariba has incurred a total of approximately $33.6 million in special charges relating to, among other things, equity investments, and costs related to the cancelled Agile acquisition. The Company also has written down approximately $1.4 billion of goodwill related to an acquisition.

20. On October 24, 2001, the Company issued a press release entitled, "Ariba Reports Results for Fourth Quarter and Fiscal 2001; Q4 Fiscal 2001 Revenue Beats Analyst Estimates." The press release stated in part:

> Ariba, Inc., the leading spend management solutions provider, today announced results for the fourth quarter and fiscal year ended September 30, 2001.
>
> Quarterly Results
>
> Revenues for the fourth quarter of fiscal 2001 were at $62.6 million. Net loss for the quarter excluding certain non-cash and special charges was $27.7 million or a loss of $0.11 per share, beating the First Call consensus estimate of a loss of $0.13 per share. During the corresponding quarter in fiscal 2000, the net loss was $1.1 million or a loss of $0.00 per share, excluding certain non-cash and special charges.
>
> Net loss on a GAAP basis for the fourth quarter of fiscal 2001 was $224.3 million, or a loss of $0.89 per share. During the corresponding quarter in fiscal 2000 the net loss on a GAAP basis was $339.3 million, or a loss of $1.50 per share.
>
> Fiscal Year Results
>
> Fiscal year 2001 results were $408.8 million, up 47 percent versus $279.0 million in fiscal 2000. Net loss for the fiscal year 2001 excluding certain non-cash and special charges weas $88.1 million or a loss of $0.36 per share. During fiscal 2000, the net loss was $29.5 million or a loss of $0.15 per share, excluding certain non-cash and special charges.
>
> Net loss on a GAAP basis for fiscal year 2001 was $2,680.7 million, or a loss of $10.96 per share. During the corresponding fiscal year 2000, net loss on a GAAP basis was $792.8 million, or a loss of $4.10 per share.
>
> "We reported a solid quarter despite the soft economic environment and the unexpected and tragic events in September," said Bob Calderoni, president and CEO, Ariba. "Because we quickly responded to the early signs of the changing economic climate and took the necessary steps, our focus now is entirely on customers and our strategy for growth. Our revenues are in line with our original forecast, our cash remains strong at $294 million, and we are well positioned for future profitability.
>
> Our October 17, 2001, Ariba announced the appointment of Bob Calderoni as president and CEO. Founder Keith Krach will remain as chairman of the board.

21. On January 22, 2002, the Company issued a press release entitled, "Ariba Reports Results for First Quarter Fiscal 2002; Quarterly Revenues Total $55.3 Million." The press release stated in part:

> Ariba Inc., the leading enterprise spend management solutions provider, today announced results for the first fiscal quarter ended December 31, 2001.
>
> Revenues for the first quarter of fiscal 2002 were $55.3 million. Pro forma net loss for the quarter excluding certain non-cash and special charges was $6.9 million or a loss of $0.03 per share, beating the First Call consensus estimate of a

> loss of $0.05 per share. Ariba's pro forma operating results exclude expenses related to the amortization of goodwill and other intangible assets, business partner warrants and stock-based compensation, all of which are included for GAAP reporting purposes. During the corresponding quarter in fiscal 2001, pro forma net income was $14.0 million, or $0.05 per share, excluding certain non-cash and special charges. Net loss on a GAAP basis for the first quarter of fiscal 2002 was $161.3 million, or a loss of $0.63 per share. During the corresponding quarter in fiscal 2001 the net loss on a GAAP basis was $347.6 million, or a loss of $1.48 per share.
>
> "In light of the continued soft global economic environment, I am pleased with the solid results for the quarter." said Bob Calderoni, president and CEO of Ariba. "The Ariba® Spend Management suite, especially Ariba® Enterprises Sourcing™, gained traction in our existing installed base as well as with new customers. As I look out to the second half of this calendar year, I expect further reach from our new products. I feel this positions us well for pro forma profitability and believe we could achieve pro forma break-even as early as June."

22. On April 24, 2002, the Company issued a press release entitled, "Ariba Reports Results for Second Quarter Fiscal 2002; Quarterly Revenues Grow to $57.2 Million." The press release stated in part:

> Ariba, Inc., the leading Enterprise Spend Management (ESM) solutions provider, today announced results for the second fiscal quarter ended March 31, 2002.
>
> Revenues for the second quarter of fiscal 2002 were $57.2 million. Pro forma net income for the quarter excluding certain non-cash and special charges was $1.1 million, or $0.00 per share, beating the First Call consensus estimate of a loss of $0.01 per share. Ariba's pro forma operating results exclude expenses related to the amortization of goodwill and other intangible assets, business partner warrants, restructuring and lease abandonment costs and stock-based compensation, all of which are included for GAAP reporting purposes. For the second quarter of fiscal 2001, pro forma loss was $48.3 million, or a loss of $0.20 per share. Net loss on a GAAP basis for the second quarter of fiscal 2002 was $154 million, or a loss of $0.60 per share. During the corresponding quarter in fiscal 2001 the net loss on a GAAP basis was $1.8 billion, or a loss of $7.60 per share.
>
> "Despite a challenging market environment, I am pleased with Ariba's performance during the March quarter. Ariba beat expectations once again, strengthened revenues, improved pro forma earnings per share, and demonstrated stability across the income statement and balance sheet," said Bob Calderoni, president and CEO of Ariba. "Ariba is building a reputation as a company that executes even in tough market conditions. We are well positioned for any acceleration in top line revenue to directly result in pro forma profitability and earnings growth. We have successfully hit pro forma breakeven before schedule and expect pro forma earnings per share to increase when the market for IT spending expands."

23. On December 31, 2002, the Company issued a press release entitled, "Ariba to Restate Fiscal Year 2001 Financial Statements; Delays Filing of Fiscal Year 2002 Annual Report on Form 10-K." The press release stated in part:

Ariba, Inc. announced today that it will restate its financial statements for the fiscal year ended September 30, 2001 for the quarter ended March 31, 2001 as a result of an ongoing review by the company's audit committee. The review is focused on the accounting treatment relating to certain benefits provided to a limited number of employees of the company during fiscal years 2000 and 2001. In addition, Ariba has delayed the filing of its annual report on Form 10-K for the fiscal year ended September 30, 2002, which was due on Dec. 30, 2002, until this review is complete. In connection with this delay, Ariba is filing a Notification of Late Filing or Form 12b-25 with the Securities and Exchange Commission (SEC).

The audit committee's review has primarily focused on a $10 million payment, provided personally by Keith Krach, the company's chairman and co-founder, in March 2001 to Larry Mueller, the company's president and chief operating officer at the time of the payment. Because no company funds were used and there was no commitment to or from Ariba, the company originally viewed the payment as a personal transaction. Ariba has now concluded that for accounting purposes, the company should treat the $10 million payment as a capital contribution from Mr. Krach to the company and the payment of compensation from the company to Mr. Mueller.

The $10 million payment at issue does not affect the company's results of operations for fiscal year 2002 nor does no it affect the company's results of operations for any quarter other than the quarter ended March 31, 2001. The company's restated financial statements for the fiscal year ended September 30, 2001 and for the quarter ended March 31, 2001 will reflect a non-cash charge to the company's fiscal 2001 operating expenses that does not affect the company's cash balances, net assets or total stockholders' equity at March 31, 2001 or for any other period.

The audit committee began this review on December 21, 2002, and expects to complete it shortly. Although the review is not completed. Ariba has determined that it will restate its financial statements for the fiscal year ended September 30, 2001 and the quarter ended March 31, 2001. The company's previously filed financial statements for these periods do not reflect the $10 million payment. As a result, the restated financial statements will disclose an additional $10 million in compensation for such periods. Investors accordingly should not rely on the financial information contained in the company's previously filed annual report on Form 10-K for the fiscal year ended September 30, 2001 or in the company's quarterly report on Form 10-Q for the quarter ended March 31, 2001. Restated financial statements for these periods will be included in Ariba's annual report on Form 10-K for the fiscal year ended September 30, 2002 filed with the SEC.

## ARIBA'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

24. The 2000-2002 results were included in Forms 10-Q and 10-K filed with the SEC. The results were also included in press releases disseminated to the public.

25. Ariba has now admitted that it inappropriately recorded transactions included in its 2000-2002 results, and has restated those results to increase the Company's expenses such that its

2000-2002 financial statements were not a fair presentation of Ariba's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

26. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

27. In Ariba's 2000-2001 Form 10-K, it represented that it recognized revenue and expenses in accordance with GAAP.

28. During the Class Period, Ariba failed to properly recognize expenses required to be recognized by GAAP.

29. On January 15, 2003, the Company issued a press release entitled, "Ariba Provides Update on Accounting Review and Restatement of Financial Statements." The press release stated in part:

> Ariba, Inc. announced today that it will restate its financial statements for the fiscal years ended September 30, 2001 and 2000 and for the quarters ended March 31, 2000 through June 30, 2002 as a result of an ongoing review of accounting matters. The company also announced that because this review is not yet completed, it has not yet filed its annual report on Form 10-K for the fiscal year ended September 30, 2002 with the Securities and Exchange Commission.
>
> As previously disclosed, Ariba has determined that, for accounting purposes, it should treat a $10.0 million payment provided personally by Keith Krach, Ariba's chairman and co-founder, in March 2001 to Larry Mueller, its president and chief operating officer at the time, as a $10.0 million capital contribution from Mr. Krach to Ariba and the payment of compensation from Ariba to Mr. Mueller. Because no company funds were used and there was no commitment to or from Ariba, the company originally viewed the payment as a personal transaction.
>
> The company has further determined that chartered air services, provided personally by Mr. Krach to Mr. Mueller, should be treated similarly as a capital contribution from Mr. Krach to Ariba and a payment of compensation from the company to Mr. Mueller. These services were provided over the period from September 2000 through July 2001 at a total cost of $1.2 million.

> In addition, Ariba has concluded that certain stock options issued to a limited number of individuals by companies that Ariba acquired during fiscal 2000 should be accounted for as stock-based compensation expense to Ariba, rather than amortized as goodwill. As a result, an increase in non-cash stock-based compensation expense and a reduction of goodwill amortization expense will be reflected in Ariba's restated financial statements for fiscal 2000, 2001 and 2002.
>
> None of the above-described adjustments has any impact on Ariba's cash balances or net cash flows for any period. In addition to the $10.0 million payment, the adjustment for the chartered air services amounts to $1.2 million. The cumulative adjustments related to the stock options amount to $7.5 million, consisting of increases to Ariba's expenses for fiscal 2000 and 2001 of $8.7 million and $12.0 million, respectively, and a reduction of expenses for fiscal 2002 of $13.2 million.
>
> As a result of these accounting adjustments investors should not rely on the financial information contained in the company's previously filed annual report on Form 10-K for the fiscal years ended September 30, 2000 and September 30, 2001 or in the company's quarterly report on Form 10-Q for the quarters ended March 31, 2000 through June 30, 2002.
>
> The ongoing accounting review is focused on the company's fiscal 2000 financial statements. Ariba is committed to performing a complete and thorough review of these matters and expects the review to be completed by the end of February 2003. Ariba intends to file its annual report on Form 10-K for the fiscal year ended September 30, 2002 after the completion of the review.
>
> Ariba also announced that it expects to receive a Nasdaq staff determination that it is subject to delisting from the Nasdaq Stock Market as a result of failing to timely file its annual report on Form 10-K for the fiscal year ended September 30, 2002. Upon receipt of this determination, Ariba intends to request a hearing before a Nasdaq panel to review the staff determination. There can be no assurance that the Nasdaq panel will grant Ariba's request for continued listing.

30. The fact that Ariba will restate its financial statements for 2000-2002 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Ariba was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Ariba's restatement

was not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatement is an admission by Ariba that its previously issued financial results and its public statements regarding those results were false.

31. Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e) The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f) The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

32. Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**FIRST CLAIM FOR RELIEF**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants**

33. Plaintiff incorporates ¶¶1-32 by reference.

34. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

35. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Ariba publicly traded securities during the Class Period.

36. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ariba publicly traded securities. Plaintiff and the Class would not have purchased Ariba publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

37. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Ariba publicly traded securities during the Class Period.

**SECOND CLAIM FOR RELIEF**

**For Violation of §20(a) of the 1934 Act Against All Defendants**

38. Plaintiff incorporates ¶¶1-37 by reference.

39. The executive officers of Ariba prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Individual Defendants controlled other employees of Ariba. Ariba controlled the Individual Defendants and each of its officers, executives and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**CLASS ACTION ALLEGATIONS**

40. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Ariba publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants, directors and officers of Ariba and their families and affiliates.

41. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period Ariba had more than 265 million shares of stock outstanding, owned by thousands of persons.

42. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d) Whether defendants knew or recklessly disregarded that their statements were false and misleading.

**PRAYER**

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such equitable/injunctive or other relief as the Court may deem proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: January 21, 2003

MILBERG WEISS BERSHAD
HYNES & LERACH LLP
REED R. KATHREIN

_______________________________
REED R. KATHREIN

100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

MILBERG WEISS BERSHAD
HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

ATTORNEY OF RECORD FOR
PLAINTIFF GERALD E. VANGSGARD